1
2
3
4
5
6
7
8               **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10

11   WILLIE Q. W.,[1]                          Case No. 2:24-cv-09766-PD

12                   Plaintiff,
                                               **MEMORANDUM OPINION**
13        v.                                   **AND ORDER AFFIRMING**
                                               **AGENCY DECISION**
14   FRANK BISIGNANO,[2]

15   COMMISSIONER OF SOCIAL SECURITY,

16                   Defendant.

17

18        Plaintiff challenges the denial of his applications for Social Security

19   Disability Insurance Benefits ("DIB") and Supplemental Security Income

20   ("SSI").  For the reasons stated below, the decision of the Administrative Law

21   Judge is affirmed.

22

23

24   _____

25        [1] Plaintiff's name is partially redacted in accordance with Federal Rule of
     Civil Procedure 5.2(c)(2)(B) and the recommendation of the United States Judicial
26   Conference Committee on Court Administration and Case Management.

27        [2] Frank Bisignano became the Commissioner of Social Security on May 6,
28   2025, and is substituted as Defendant in this suit.  *See* 42 U.S.C. § 405(g).

## I.    Pertinent Procedural History and Disputed Issues

On July 6 and November 24, 2021, Plaintiff filed applications for SSI and DIB, respectively.  [Administrative Record ("AR") 272, 281.[3]]  Plaintiff alleges that he became disabled and unable to work on January 1, 2019.  [*Id.*]  Plaintiff's application was denied on April 26, 2022 and upon reconsideration on May 20, 2022.  [AR 168, 179.]  Plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on December 1, 2023.  [AR 46.]  Plaintiff appeared with counsel, and the ALJ heard testimony from Plaintiff and a vocational expert ("VE").  [AR 46-47.]  On January 30, 2024, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act ("SSA").  [AR 40.]  The Appeals Council denied Plaintiff's request for review on October 4, 2024, rendering the ALJ's decision the final decision of the Commissioner.  [AR 1.]

The ALJ followed the five-step sequential evaluation process to assess whether Plaintiff was disabled under the SSA.  *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995), *superseded on other grounds by regulation*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5852 (Jan. 18, 2017) (codified at 20 C.F.R. pts. 404 & 416), *as recognized in Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022).

At step one, the ALJ found that there has been a continuous 12-month period in which Plaintiff had not engaged in substantial gainful activity, which began after September 2021.  [AR 19-20.]

At step two, the ALJ found that Plaintiff had the following severe impairments: "schizoaffective disorder, paranoid schizophrenia, anxiety, and bipolar I disorder (20 CFR 404.1520(c) and 416.920(c))."  [AR 20.]  The ALJ found the medically determinable impairments significantly limit Plaintiff's

---

[3] The Administrative Record is at Docket Numbers 14-1 through 14-8.

ability to perform basic work activities.  [*Id.*]  After considering the record, the ALJ also found that the following were not medically determinable impairments:  major depression with psychosis, substance-induced psychosis (compounding primary illness), multiple dermoid cysts in the scalp post dermoid cyst removal, nonspecific headaches, a herniated disc, and migraines. [AR 20-22.]

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  [AR 22.]

Before proceeding to step four, the ALJ determined that Plaintiff has the Residual Functional Capacity ("RFC") to "perform a full range of work at all exertional levels but with the following nonexertional limitations":

> [H]e can handle occasional changes in a routine work setting and use judgment to make simple decisions.  He cannot perform work requiring a specific production rate, such as assembly-line work, or work that requires hourly quotas, but he can perform goal-oriented work that can be completed by the end of the work shift. He can have occasional interaction with supervisors and co-workers, in a job working primarily with things rather than people, and no interaction with general public.

[AR 25.]

At step four, the ALJ found that Plaintiff is unable to perform his past relevant work as a concession vendor, either as actually or generally performed.  [AR 38-39.]

At step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ found there are jobs which exist in significant numbers in the national economy that Plaintiff can perform, in the occupations of "night cleaner," "dishwasher," and "furniture stripper."  [AR 39.]  Accordingly, the

ALJ concluded that Plaintiff has not been under a disability as defined in the SSA from January 1, 2019 through the date of the ALJ's decision.  [AR 40.]

Plaintiff raises two issues:  first, whether the ALJ provided clear, convincing, and well-supported reasons for discounting Plaintiff's subjective symptom testimony as to his mental dysfunction; and second, whether the ALJ adequately explained departing from the prior administrative medical findings of Dr. Heather Abrahimi, Psy.D. in crafting the RFC.  [Dkt. No. 15 at 6, 14.]

## II.    Standard of Review

Under 42 U.S.C. § 405(g), a district court may review the agency's decision to deny benefits.  A court will vacate the agency's decision "only if the ALJ's decision was not supported by substantial evidence in the record as a whole or if the ALJ applied the wrong legal standard."  *Coleman v. Saul*, 979 F.3d 751, 755 (9th Cir. 2020) (citation and internal quotation marks omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *Id.* (citation and internal quotation marks omitted); *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (same).

It is the ALJ's responsibility to determine credibility and to resolve conflicts in the medical evidence and ambiguities in the record.  *Ford v. Saul*, 950 F.3d 1141, 1149 (9th Cir. 2020).  "Where evidence is susceptible to more than one rational interpretation," the ALJ's reasonable evaluation of the proof should be upheld.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Tran v. Saul*, 804 F. App'x 676, 678 (9th Cir. 2020).[4]

---

[4] Although statements in unpublished Ninth Circuit opinions "may prove useful [] as examples of the applications of settled legal principles," the Ninth Circuit has cautioned lower courts not to rely heavily on such memorandum dispositions particularly as to issues of law.  *Grimm v. City of Portland*, 971 F.3d 1060, 1067 (9th

Error in Social Security determinations is subject to harmless error analysis. *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012). Error is harmless if it is "inconsequential to the ultimate nondisability determination" or, despite the legal error, "if the agency's path may reasonably be discerned." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citation and internal quotation marks omitted).

## III.    Discussion

### A.    The ALJ Did Not Err in Discounting Plaintiff's Subjective Symptom Testimony

Plaintiff argues the ALJ erred by discounting his subjective symptom testimony as to his mental dysfunction. [AR 15 at 6.]

#### 1.    Relevant Law

"To determine whether a claimant's subjective symptom testimony is credible, the ALJ must engage in a two-step analysis: 'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Ferguson v. O'Malley*, 95 F.4th 1194, 1199-1200 (9th Cir. 2024) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014)). If step one is satisfied and there is no evidence of malingering, the ALJ can only reject the claimant's subjective symptom testimony "by offering specific, clear and convincing reasons for doing so." *Id.* (citation and internal quotation marks omitted).

At step two, an ALJ must identify which testimony is not credible and "link that testimony to the particular parts of the record supporting her non-credibility determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th

Cir. 2020) ("a nonprecedential disposition is not appropriately used . . . as the pivotal basis for a legal ruling by a district court").

5

Cir. 2015); *accord Ferguson*, 95 F.4th at 1200. "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)); *see also Smartt v. Kijakazi,* 53 F.4th 489*,* 499 (9th Cir. 2022) ("Ultimately, the 'clear and convincing' standard requires an ALJ to show [their] work[.]"). Thus, to satisfy the substantial evidence standard, the ALJ must provide specific, clear, and convincing reasons which explain why the medical evidence is *inconsistent* with the claimant's subjective symptom testimony. *Ferguson*, 95 F.4th at 1200 (emphasis in original).

A court must "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [they] did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). The court "may not take a general finding — an unspecified conflict between Claimant's testimony about daily activities and her reports to doctors — and comb the administrative record to find specific conflicts." *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014). ALJs must instead point to specific facts in the record to find a lack of credibility, and such findings are insufficiently specific where they are general, unspecified, and/or made in passing in a different section than the credibility determination. *Id.*

An ALJ can consider whether there is a lack of objective medical evidence supporting a claimant's allegations. However, this factor "cannot form the sole basis" for discounting subjective symptom testimony. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *Davis v. Berryhill*, 736 F. App'x 662, 665 (9th Cir. 2018).

When there is an error with one of the grounds the ALJ relied upon, "the relevant inquiry in this context is . . . whether the ALJ's decision remains legally valid, despite such error." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533

F.3d 1155, 1162 (9th Cir. 2008).  If an ALJ impermissibly relies "on one of several reasons in support of an adverse credibility determination," the error is harmless if "the ALJ's remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record."  *Id.* at 1162 (emphasis omitted).

### 2.    Plaintiff's Subjective Symptom Testimony

Plaintiff was formerly a food and alcohol cashier who worked at Angel Stadium in Anaheim and Dodger's Stadium in Los Angeles.  [AR 59, 62.]  The ALJ asked Plaintiff what problems are keeping him from being able to work.  [AR 64.]  Plaintiff pointed to mental issues, head issues, and physical issues with his back and his knee.  [*Id.*]

### a)    Mental Issues

As to mental issues, Plaintiff discussed them throughout the hearing. He noted his first mental break was on January 1, 2019.  [AR 57-58.]  He was laid off in 2021 because there were times when he was tardy or could not make it into work due to his stress and anxiety.  [AR 61-62.]  In September 2023, Plaintiff tried to take a security job.  [AR 62.]  That lasted about two weeks because his legs hurt from long standing periods; his energy levels, anxiety, and mood swings made it difficult for him to get out of bed; and his commute was three hours each way.  [AR 62-63.]

At some point after his mental break, he began to use methamphetamines to get by and keep his mind focused.  [AR 68.]  In March 2021, his mother and sister placed him on a 5150 psychiatric hold.  [AR 68-69.]  According to Plaintiff, they did so because they heard him talking to himself and saying that he felt worthless and did not want to live, but that he was not yelling, did not have a knife, and did not say he wanted to kill himself.  [AR 69.]  After the 5150 hold, Plaintiff started taking medications

7

and stopped taking methamphetamines, which gave him less stress, less anxiety, and a clear mind.  His medications included Abilify,[5] and they changed over time as his doctors tried trial and error to see what worked best for him.  [AR 73-74.]  Plaintiff had a hospital admission in January 2022.  [AR 73.]  This was because his prescribing psychiatrist went on vacation, and Plaintiff did not have a way to get his medications for nine weeks.  [*Id.*]  The hospital put Plaintiff back on Abilify and his other medications, which helped him.  [*Id.*]  In July 2022, Plaintiff relapsed on methamphetamines because his mother was hospitalized due to her own medical issues, which emotionally triggered Plaintiff because Plaintiff's father died when Plaintiff was 15 years old.  [*Id.*]  In June 2023, Plaintiff had a 24-hour emergency room visit for panic attacks and anxiety.  [AR 74-75.]  At some point in 2023, he had spent 62 days in rehabilitation to make sure he would not slip up with alcohol issues, substance abuse, and anger management.  [AR 78.]  He also discussed going to the rehab because he did not have somewhere to live.  [*Id.*]

As of the hearing, Plaintiff took Abilify (400 mg monthly), Zoloft (150 mg daily),[6] and Depakote (500 mg daily).[7]  [AR 71.]  Plaintiff also discussed how he tries to be on top of taking his daily medications because they really

---

[5] Abilify (generic: aripiprazole) injection is used to treat agitation caused by schizophrenia or bipolar mania.  Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/aripiprazole-intramuscular-route/description/drg-20069716 (last visited Aug. 20, 2025).

[6] Zoloft (generic: sertraline) is used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, premenstrual dysphoric disorder (PMDD), posttraumatic stress disorder (PTSD), and social anxiety disorder (SAD).  Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (last visited Aug. 20, 2025).

[7] Depakote (generic: divalproex sodium) is used to treat certain types of seizures, to treat the manic phase of bipolar disorder, and to help prevent migraine headaches.  Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/divalproex-sodium-oral-route/description/drg-20072886 (last visited Aug. 20, 2025).

help him and if he does not take them his days get "really bad." [*Id.*]

### b) Head Issues

Plaintiff has headaches. [AR 66.] Plaintiff, who was 33 years old at the time of the hearing, discussed having nine different surgeries on his head because of cancer, which he had when he was 18 or 19 years old. [AR 55, 65.] He had the same type of cancerous growths that killed his father. [AR 65.] Plaintiff also underwent chemotherapy and radiation; he is now cancer free. [AR 65-66.] Even though his hair grew back after he lost all of it, it did not come back the way it had been. [AR 65.] Plaintiff's head still bleeds at night because the cyst sites never recovered. [AR 82.] They will also bleed if he gets "too much excitement or too much pressure." [*Id.*]

In addition to physical head pain, he gets depressed and panicked about his head. [AR 82.] He is self-conscious of how he looks: he feels like a "monster" some days because of what he looks like and recalls a woman telling him that he looks "almost like Frankenstein." [AR 65, 82.] He wears beanies and hats so that no one will see his head. [AR 82.] However, Plaintiff did not recall having any treatment for headaches in the last two or three years. [AR 66.] He testified to trying to "tough it out or stick it out because ultimately [he doesn't] want to think about having the same issues again" because they terrify him. [*Id.*]

### c) Back and Knee Issues

When Plaintiff was employed as a cashier, he sold food and alcohol, which required him to be on his feet his entire shift. [AR 60.] Because he sold beer, he had to move kegs weighing about 80 to 150 pounds daily, which caused him to pull his back. [AR 60-61.]

Plaintiff stated he had "really bad back pain" and "really bad knee pain." [AR 64.] Plaintiff repeated this claim later in his testimony, and he

9

also indicated back and mobility issues in his Function Report. [AR 72, 361, 366.] The ALJ asked him if he had any treatment for his back or his knees. [*Id.*] Plaintiff responded that he had not. Plaintiff's counsel subsequently asked Plaintiff about what helped he required from others, to which Plaintiff responded that he needed help with mobility, including "getting up in the morning" and "getting around." [AR 81.] Counsel asked if Plaintiff had ever been given a brace or an assistive device; Plaintiff answered that he would "love one" but had not been offered any. [*Id.*] This corresponded with Plaintiff's non-responses in his Function Report to whether he used various assistive devices, such as crutches, a cane, a walker, or a wheelchair. [AR 367.]

### 3.    The ALJ's Findings

The ALJ discussed Plaintiff's subjective symptom testimony when summarizing the medical evidence. [AR 26-34.] While the ALJ noted Plaintiff's testimony that "his mood swings and anxiety along with problems with his back, head, and knee keep him from working", the ALJ focused the summary on Plaintiff's mental impairments because the ALJ did not find at step two that he had any physical severe impairments. [AR 20-22, 33.]

The ALJ found "claimant's allegations of mental impairments are somewhat persuasive." [AR 34.] Accordingly, the ALJ included multiple nonexertional limitations into the RFC. [*Id.*]

However, the ALJ also determined that "the medical evidence does not support any further limitations." [*Id.*] The ALJ provided three reasons in support of this conclusion. First, after noting the existence of and reasons for significant gaps in the record regarding his history of mental health treatment, "the records and his testimony indicate he was overall doing better and stable when taking his psychiatric medications and not using drugs or

alcohol.  His psychiatric hospitalizations all seemed related to non-compliance with medications and/or drug and alcohol abuse." [*Id.*]  Second, "[t]here is no indication in the record that he ever had any therapy or counseling except a few visits in the fall of 2023." [*Id.*]  Finally, "[a]s for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because when he was on psychiatric [medications] and sober, the results of [his] mental status examinations are consistent with the above residual functional capacity." [AR 34-35.]

### 4.    The Parties' Arguments

Plaintiff argues the ALJ erred in discounting Plaintiff's mental subjective symptom testimony.[8]  [Dkt. No. 15 at 9.]  According to Plaintiff, the ALJ inferred his mental symptoms were not disabling because he did not pursue consistent treatment and did not follow through with outpatient care, which ignored the impact of Plaintiff's psychosis.  [*Id.* at 10 (citing *Van Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.") (internal quotation marks and citation omitted)).]  Plaintiff points to his repeated hospitalizations, rehabilitations, and outpatient treatments from 2021 through 2023 as evidence of the severity of his mental impairments.  [*Id.* at 6-9.]  Plaintiff further argues that the overall medical record demonstrates that his psychotic symptoms were disabling, even when he was medicated and not on drugs.  [*Id.* at 10-13.]  Plaintiff points to various parts of the medical record in support of this argument.  [*Id.*]

---

[8] Plaintiff does not argue that the ALJ erred as to discounting Plaintiff's subjective symptom testimony regarding his physical symptoms.

Plaintiff also raises a procedural issue.  Plaintiff argues the ALJ erred because the ALJ "must apply Social Security Rulin[g] 13-2p and evaluate whether the claimant is disabled with such substance use or alcoholism" if the ALJ "believed that Plaintiff's use of illicit drugs and/or alcohol materially contributed to his acute psychosis leading to psychiatric hospitalizations[.]" [*Id.* at 11 (emphasis omitted).]  According to Plaintiff, the ALJ committed "harmful legal error" by not following SSR 13-2p because proper application of SSR 13-2p would have shown Plaintiff's psychotic symptoms and periods of acute schizophrenia persisted even while he was abstaining from the use of illicit drugs.  [*Id.* at 12.]

The Commissioner argues, "[t]he ALJ thoroughly discussed the evidence that was available and acknowledged that the record contained abnormal findings on the mental status examinations (MSE) during Plaintiff's hospitalizations but also noted with treatment and ongoing sobriety those findings generally normalized during his stays."  [Dkt. No. 16 at 8.]  The Commissioner also argues that Plaintiff's argument regarding SSR 13-2p "is a red herring" because "[t]he ALJ did not find Plaintiff's drug addiction or alcoholism to be material [and] the State agency medical consultants found no evidence of a DAA[9] issue, and therefore the analysis in SSR 13-2p is not relevant." [*Id.* at 8-9.]

### 5.    The ALJ Did Not Err When Discounting the Subjective Symptom Testimony

The ALJ provided two specific, clear, and convincing reasons why Plaintiff's subjective symptom testimony as to the intensity, persistence, and limiting effects of his mental issues was *partially* inconsistent with the

---

[9] "DAA" is short for "drug addiction and alcoholism."  *See* SSR 13-2p:  Titles II and XVI:  Evaluating Cases Involving Drug Addiction and Alcoholism (DAA).

medical evidence.[10]  [AR 34-35.]  *See Ferguson*, 95 F.4th at 1200.

The first reason is that the overall medical record (including consideration of the gaps and the reasons for those gaps) showed Plaintiff did well when medicated and when not on drugs, and poorly (to the point of hospitalization) when unmedicated or on drugs.  This is a specific, clear, and convincing reason because it would show a direct contradiction between Plaintiff's claim that he is too disabled to work because of his mental impairments and objective medical evidence showing that he is able to work when (1) he has unimpeded access to his prescribed psychiatric medications, (2) he is consistently taking his prescribed psychiatric medications, and (3) he is consistently not taking drugs.  Although mental illnesses could theoretically impede a claimant's ability to consistently take their prescribed medications, the ALJ discussed in the decision how that was not what the evidence showed in this case.  Substantial evidence from the medical record supports the ALJ's finding on this point, and that evidence was cited in the ALJ's decision.  [AR 35 (citing AR 463, 495-506, 514-16, 575-84, 604-21, 626-27, 633-36, 638, 651, 672-76, 742-44).]

Contrary to Plaintiff's argument, the ALJ did not ignore the impact of Plaintiff's psychosis and made an inference about Plaintiff's mental symptoms based on the absence of certain treatment records.  Rather, the ALJ's robust and nuanced decision indicates that ALJ grappled thoughtfully with all of the evidence in the record — including the credible portions of Plaintiff's subjective symptom testimony, the existing portions of the medical record, and the reasons Plaintiff stated as to why other portions of the medical record did not exist — before crafting the RFC.  [AR 25-38.]  To the extent there were

---

[10] As noted above, the ALJ found Plaintiff's subjective symptom testimony "somewhat persuasive" and did include multiple nonexertional limitations based on the testimony and the rest of the record evidence.

inadequacies and/or ambiguities posed by the absence of certain records, they were cleared up at the hearing by the ALJ, who thoroughly inquired as to the various medical records and periods in this matter.  [AR 58-59 (ALJ asking about lack of medical records from 2018 to 2021), AR 64-65 (ALJ asking about lack of medical records for back and knee issues), AR 65-66 (ALJ asking about Plaintiff's cancer and headache treatments), AR 67-82 (ALJ asking about Plaintiff's mental issues, hospitalizations, and medications).]  *Accord Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) ("[T]he ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel.").  As the ALJ posits a rational interpretation that is supported by substantial evidence, the ALJ's reasonable evaluation should be upheld.  *Ryan*, 528 F.3d at 1198.

The second reason is that the results of Plaintiff's mental status examinations were consistent with the RFC.  This is a specific, clear, and convincing reason because it would show a direct contradiction between Plaintiff's claim that he is too disabled to work because of his mental impairments and evidence that he can work within certain nonexertional limitations.  In the decision, the ALJ repeatedly discussed multiple mental status examinations, including those taken by Mario Pacheco, N.P. on January 21, 2022; Dr. Stephen Erhart on January 25, 2022; Eunice Lee, P.M.H.N.P.[11] from February 2022 to July 2022; and Dr. Leilani Sharpe in August 2023.  [AR 22-31.]  Plaintiff only cites one mental examination from when Plaintiff was hospitalized in April 2021 and does not make arguments as to any of these mental status examinations.  Substantial evidence from these mental status examinations supports the ALJ's finding that Plaintiff should have some, but not complete, nonexertional limitations in the RFC.

---

[11] P.M.H.N.P. is the acronym for Psychiatric Mental Health Nurse Practitioner.

1    The ALJ also gave a third reason for discounting Plaintiff's subjective
2    symptom testimony -- that there was "no indication in the record that he ever
3    had any therapy or counseling except a few visits in the fall of 2023." [AR 34.]
4    However, the record demonstrates Plaintiff was hospitalized multiple times
5    since the onset of his mental illnesses.  As noted earlier in the ALJ's decision,
6    Plaintiff received individual, group, and milieu therapy during his March
7    2021 hospitalization and individual, group, and adjunctive therapy during his
8    January 6, 2022 hospitalization.  [AR 27 (citing AR 514), 28 (citing AR 530-
9    55).]  The record on whether Plaintiff sought therapy or counseling is
10   ambiguous, and the ALJ did not resolve the ambiguity in the decision.  Thus,
11   the ALJ did not give a specific, clear, and convincing reason for discounting
12   Plaintiff's subjective symptom testimony when citing his therapy and
13   counseling visits.

14       In summary, the ALJ gave two specific, clear, and convincing reasons
15   for discounting Plaintiff's subjective symptom testimony:  the overall medical
16   record showed Plaintiff did well when on medications and when not on drugs,
17   and poorly when unmedicated or on drugs; and the results of Plaintiff's
18   mental status examinations were consistent with the RFC.  These two reasons
19   are sufficient to uphold the ALJ's discounting of the subjective symptom
20   testimony.  *Burch*, 400 F.3d at 681.  Accordingly, the ALJ did not err in
21   discounting Plaintiff's subjective symptom testimony.

22       Finally, as to the procedural issue, the Commissioner "make[s] a DAA
23   materiality determination only when:  i. [the Commissioner has] medical
24   evidence from an acceptable medical source establishing that a claimant has a
25   Substance Use Disorder, and ii. [the Commissioner] find[s] that the claimant
26   is disabled considering all impairments, including the DAA."  SSR 13-2p, 3.a.
27   Here, the ALJ did not establish that Plaintiff had a substance abuse disorder.
28   To the contrary, the ALJ rejected a finding that Plaintiff had a severe

impairment of substance-induced psychosis (compounding primary illness). [AR 20.] Because the ALJ did not find that Plaintiff had a substance use disorder, the ALJ was not required to conduct a DAA analysis pursuant to SSR 13-2p, and the ALJ did not err by omitting that analysis from the decision.

**B.    The ALJ Did Not Err When Departing from Dr. Abrahimi's Prior Administrative Medical Findings in Crafting the RFC**

Plaintiff argues the ALJ erred by departing without explanation from the prior administrative medical findings of Dr. Abrahimi, the State agency psychologist who reviewed Plaintiff's DIB and SSI applications on reconsideration.[12]  [Dkt. No. 15 at 14.]

**1.    Relevant Law**

An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling 96-8P, 1996 WL 374184, at *1 (July 2, 1996).  It reflects the most a claimant can do despite their limitations. *Smolen v. Chater*, 80 F.3d 1273, 1291 (9th Cir. 1996).  An RFC determination must be based on all of the relevant evidence, including the diagnoses, treatment, observations, and opinions of medical sources, such as treating and

_____

[12] Plaintiff uses the term "medical source opinion" to describe Dr. Abrahimi's findings, including her findings as to his RFC.  [*See* Dkt. Nos. 15 at 6, 14-16; 18 at 2-4.]  The Court uses the term "prior administrative medical findings" for Dr. Abrahimi's findings because that is the term used in the Social Security regulations for findings about medical issues made by the Commissioner's medical and psychological consultants at a prior level of review based on their review of the evidence in the case record, including as to claimants' RFCs.  20 C.F.R. §§ 404.1513(a)(5)(iv), 416.913(a)(5)(v).  For claims filed on or after March 27, 2017, prior administrative medical findings are considered by ALJs in the same way as medical opinions.  *See* 20 C.F.R. §§ 404.1513a(b)(1), 404.1520c, 416.913a(b)(1), 416.920c.

16

examining physicians.  20 C.F.R. § 404.1545.  The ALJ is responsible for translating and incorporating supported medical evidence into a succinct RFC.  *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). It is the ALJ's responsibility to resolve conflicts in the medical evidence and ambiguities in the record.  *Ford*, 950 F.3d at 1149.  Where this evidence is "susceptible to more than one rational interpretation" the ALJ's reasonable evaluation of the proof should be upheld.  *Ryan*, 528 F.3d at 1198.

The Social Security Administration regulations for claims filed on or after March 27, 2017 apply here.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 2017 WL 168819, at 5844-45 (Jan. 18, 2017).  Under these regulations, special deference is no longer given to the opinions of treating and examining physicians on account of their relationship with a claimant, and an ALJ's "decision to discredit any medical opinion, must simply be supported by substantial evidence."  *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022); 20 C.F.R. §§ 404.1520c(a), 416.920c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from [a claimant's] medical sources.").

The regulations require ALJs to consider and evaluate the persuasiveness of all medical opinions and prior administrative medical findings from medical sources.  *See* 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).  In determining how "persuasive" these opinions and findings are, an ALJ must consider the following factors:  supportability, consistency, relationship with claimant, specialization, and other factors that support or contradict the medical opinion or prior administrative medical finding.  20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).  "Supportability" and "consistency" are the most important factors to be considered when evaluating the persuasiveness of medical opinions and, therefore, the ALJ is required to

17

explain how both factors were considered. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Woods*, 32 F.4th at 791-92 (citing 20 C.F.R. § 404.1520c(c)(1)); 20 C.F.R. § 416.920c(c)(1). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(c)(2)); 20 C.F.R. § 416.920c(c)(2). While the ALJ's decision must articulate how the ALJ considered supportability and consistency, the decision need not explain the remaining factors unless the ALJ is deciding among differing yet equally persuasive opinions or findings on the same issue. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *Woods*, 32 F.4th at 792.

An ALJ must provide an explanation supported by substantial evidence, which articulates how they considered both supportability and consistency. *Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023); *see also Titus L. S. v. Saul*, 2021 WL 275927, at *7 (C.D. Cal. Jan. 26, 2021) (ALJ must address how they considered the consistency and supportability factors in sufficient detail to allow a reviewing court to conduct a meaningful review of whether that reasoning is supported by substantial evidence).

An RFC is defective if it fails to take a plaintiff's limitations into account. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). However, "[t]here is no requirement that the RFC recite medical opinions verbatim, rather the ALJ is responsible for translating and incorporating medical findings into a succinct RFC." *McIntosh v. Colvin*, 2018 WL 1101102, at *5 (S.D. Cal. Feb. 26, 2018); *see also Foster v. Kijakazi*, 2022 WL 3230472, at *2 (9th Cir. Aug. 10, 2022) ("An ALJ considers opinions from medical sources on the issue of a claimant's RFC, but the final responsibility for deciding this issue is reserved to the Commissioner.") (citations, internal

quotation marks, and alterations omitted).  Finally, it is well established that RFC determinations are legal decisions, not medical opinions.  *Valerie C. v. Berryhill*, 2019 WL 450675, at *6 (C.D. Cal. Feb. 5, 2019).

### 2.    Dr. Abrahimi's Prior Administrative Findings

In both the DIB and SSI reconsiderations, Dr. Abrahimi provided the following mental residual functional capacity ("MRFC"):

> [Claimant] is capable of understanding, remembering and sustaining concentration, pace and persistence for 1-2 step routines throughout a normal workday/workweek.  [Claimant] is able to accept routine supervision and interact with co-workers in a non-collaborative and superficial basis.  [Claimant] is unable to manage the demands of public contact.  [Claimant] is capable of adapting to a routine and predictable work environment, recognizing typical hazards, traveling to routine locations, and setting goals independently within the framework noted above.

[AR 141, 162.]  Dr. Abrahimi provided her prior administrative medical findings regarding Plaintiff's MRFC after evaluating his symptoms and limitations based on the record evidence, including medical opinions in the record.  [AR 125-41, 146-62.]

### 3.    The ALJ's Findings and Reasoning

The ALJ considered Dr. Abrahimi's prior administrative medical findings.  [AR 37-38.]  In doing so, the ALJ discussed the supportability and the consistency of Dr. Abrahimi's findings, including by reconciling an apparent inconsistency as to Plaintiff's ability to interact with the general public.  [*Id.*]  The ALJ found Dr. Abrahimi's findings were "overall persuasive."  [AR 38.]

After considering the entire record, the ALJ found Plaintiff has the RFC to perform a full range of work at all exertional levels.  [AR 25.]  However, the ALJ also found Plaintiff's RFC included the following nonexertional limitations:

> [H]e can handle occasional changes in a routine work setting and

use judgment to make simple decisions.  He cannot perform work requiring a specific production rate, such as assembly-line work, or work that requires hourly quotas, but he can perform goal-oriented work that can be completed by the end of the work shift. He can have occasional interaction with supervisors and co-workers, in a job working primarily with things rather than people, and no interaction with general public.

[AR 25.]

### 4.    The Parties' Arguments

Plaintiff argues the ALJ made a procedural error in crafting the RFC. Specifically, Plaintiff points to an alleged discrepancy between the ALJ's RFC ("[H]e can handle occasional changes in a routine work setting and use judgment to make simple decisions") and Dr. Abrahimi's MRFC ("[Claimant] is capable . . . for 1-2 step routines") and claims the ALJ erred by not properly explaining why the ALJ departed from this portion of the MRFC.  [Dkt. No. 15 at 14-15 (citing *Woods*, 32 F.4th at 792).]  Plaintiff argues this error was not harmless because Dr. Abrahimi's instruction contemplates occupations requiring a Dictionary of Occupational Titles ("DOT") reasoning level of one, whereas the ALJ's instruction (and the three jobs considered by the ALJ at step five) required the higher DOT reasoning level of two.  [*Id.* at 16 (citing *Rounds*, 807 F.3d at 1003, *and Zavalin v. Colvin*, 778 F.3d 842, 846-48 (9th Cir. 2014)).]

The Commissioner argues the ALJ properly considered Dr. Abrahimi's prior administrative medical findings and that substantial evidence supports the ALJ's evaluation.  [Dkt. No. 16 at 11-12.]  The Commissioner cites cases from this district and elsewhere for the proposition "that when a State agency consultant finds that a claimant can perform both simple work, and one-to-two-step tasks, an RFC for simple work accounts for the limitations contained in the consultant's findings because the most a claimant can do based on such a [prior administrative medical finding] would be simple work."  [*Id.* at 13.]

The Commissioner cites *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174-76 (9th Cir. 2008) to argue that a limitation to "simple work" accounts for "moderate limitations." [*Id.* at 15.] To that end, the Commissioner discusses the various parts of Dr. Abrahimi's prior administrative medical findings, claims "it is clear that Dr. Abrahimi did not intend to adopt a more restrictive RFC," and uses that reasoning to justify the ALJ's finding as to the RFC. [*Id.* at 14.] Finally, the Commissioner claims "there is no harmful error at step five", arguing *Rounds* is inapplicable and the three occupations in this case would be allowed with this RFC under *Zavalin*. [*Id.* at 16.]

### 5. The ALJ Adequately Explained the Departure from Dr. Abrahimi's MRFC

The Ninth Circuit has discussed conflicts between RFCs and the nonexertional demands required by certain occupations. *Zavalin* held "that there is an apparent conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 Reasoning." *Zavalin*, 778 F.3d at 847. *Rounds* held that "[t]here was an apparent conflict between [a plaintiff's] RFC, which limit[ed] her to performing one- and two-step tasks, and the demands of Level Two reasoning, which requires a person to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" *Rounds*, 807 F.3d at 1003. *Rounds* distinguished between restrictions for "simple" or "repetitive" tasks with "one or step tasks" and concluded an ALJ's RFC limitation of "one to two step tasks" is not harmless when the occupations proposed at step five involve Level Two reasoning. *Id.* at 1004.

The Court agrees with Plaintiff that the ALJ departed from Dr. Abrahimi's MRFC. Although the ALJ stated that Dr. Abrahimi's prior administrative medical findings were "overall persuasive," the ALJ implemented a less restrictive limitation ("[H]e can handle occasional changes

21

in a routine work setting and use judgment to make simple decisions") into the RFC than that found appropriate by Dr. Abrahimi ("[Claimant] is capable . . . for 1-2 step routines").  *See Rounds*, 807 F.3d at 1003.

By choosing to depart from Dr. Abrahimi's prior administrative medical finding as to this portion of the MRFC, the ALJ was required to explain the departure.  *See* SSR 96-8p ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); *see also Woods*, 32 F.4th at 792 ("Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence.").

The ALJ explained the departure from Dr. Abrahimi's MRFC.  In the "analysis" portion of the ALJ's RFC discussion, the ALJ wrote: "I limited [Plaintiff] to simple and routine instructions with only occasional changes in a routine work setting and using judgment to make simple decisions to account for his symptoms including tangential thoughts, insomnia, and hallucinations and paranoid delusions at times."  [AR 34.]  After explaining the other limitations provided, the ALJ wrote: "However, the medical evidence does not support any further limitations."  [*Id.*]  The ALJ then explained at length *why* the ALJ found that the medical evidence did not support further limitations (including reasons discussed in the section above regarding Plaintiff's subjective symptom testimony).  [*Id.*]  The ALJ's explanation is supported by substantial evidence in the medical record, which the ALJ cited in the decision.  [*Id.*]  Accordingly, this explanation was sufficient for the ALJ to depart from Dr. Abrahimi's prior administrative finding that Plaintiff's MRFC was "1-2 step routines."  *See Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) ("Our cases do not require ALJs to perform a line-by-line exegesis of the

claimant's testimony, nor do they require ALJs to draft dissertations when denying benefits.").

Finally, the three occupations at issue — "night cleaner," "dishwasher," and "furniture stripper" — all involve Level Two reasoning that are allowable under the relevant nonexertional limitation ("[H]e can handle occasional changes in a routine work setting and use judgment to make simple decisions"). *See Zavalin*, 778 F.3d at 847. Thus, this nonexertional limit in the RFC did not lead to later error at step five.

## IV.    Order

For all the reasons stated above, the Court finds that the ALJ's decision does not show legal error and is supported by substantial evidence. It therefore is affirmed. A separate judgment will issue.

Dated: August 27, 2025

_____
PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE